Before we begin argument this morning, I'd like counsel from the United States and the Gila River Indian Community and the Irrigation District to know something I think probably your best research couldn't have told you. Mr. Sparks and I have known each other for 40 years. We were fraternity brothers at Arizona State University and he was a participant in my wedding 39 years ago. We haven't had a whole lot of contact since that time. We don't, didn't practice law together and we don't socialize, not because of any affirmative decision, but that's there and there it is for you. I've also known Mr. Lewis for a long time and consider him a good professional friend, so there you are. Mr. Sparks? Good morning, Your Honor. It is a particular privilege and honor to appear before this panel and it is a particular honor and privilege to represent the San Carlos Apache Tribe. Your Honor, I would seek permission from the court to approach the clerk for just a moment to provide an illustrative map that shows where the relative positions of the reservation and irrigation districts are located. Have your opponents seen it? They've seen it many times and taken it actually from, most of it from one of their books, but if they have any objection, I certainly won't use it. Any objection to the panel viewing this? No. Thank you. May it please the court, Your Honor, Your Honors, this case is, comes in a posture to the court that is unique even for these parties because typically these parties are on the same side on a long, long-going case that began in 1924 called the Globe Equity Decree against others who, in New Mexico and upstream, who divert our opinion in disregard for the decree and in disregard for Arizona versus California, but in this particular situation and case, we are at 100 degree opposites on the issues here. The case is before the court because there, under the San Carlos Apache, on the San Carlos Apache Reservation, there is a large lake called San Carlos Lake, and you can see that large lake on the map there as the blue mark. Now, because it looks blue, it doesn't mean that it has water in it, because in times of drought, it doesn't, and at times even in a drought, it is empty. The large yellow area to the right or east of the reservation, and everything east of the reservation, north and south, used to be part of the San Carlos Reservation, and in fact, most of the land to the west of the reservation, down to where the ditch begins at Azures Teton was once in the San Carlos Reservation. For various reasons, copper mines and otherwise, lands were removed from the reservation after 1872, and the yellow mining was also removed from the reservation, so they began irrigating on the reduced-sized reservation and tried to develop an economy that went from 60 million acres for irrigated foods production, with about 25% of their life and sustenance, to one where it had to be primarily all of it, and so by the late 1880s, they were farming 9,600 acres, ran a grist mill 24 hours, 365 days a year, and were very successful, but with the removal of various lands from the reservation, and the idea that, and the fact that both of the in Arizona, both the Pimas and the San Carlos Apaches, farming crops began to fail. A solution to that was for the Pimas to build a lake, and there were other farmers that lived near them called the San Carlos Irrigation District in these days, near Florence and Coolidge, who also had farmed in early times, and also could be benefited from the construction of a lake. The bad news for the Apaches is the lake was built upon their reservation and flooded their farms, their homes, their cemeteries, and as the waters rose, they were forced to move. Their lands and agricultural lands were never replaced. In the time that they lived, where the high water, below the high water mark now, they had many of the villages because General Crook gathered Apaches and Yavapais from all over the state of Arizona and put them in the slammer at San Carlos. There was a military's presence at San Carlos until 1922, when they were removed to, the military moved itself to Fort Huachuca. In 24, the Depression, the decree was entered by stipulation by the United States. The United States, for a project called the San Carlos Irrigation Project, owned by the United States and operated by the Bureau of Indian Affairs, had, on behalf of two beneficiaries, constructed a lake which was, again, flooding in 1929. Ms. Parks. Yes, ma'am. I'm reluctant to interrupt you because it's pretty interesting, but I see we only have about nine minutes left. Okay. And I'd like to say We have about nine issues. Yeah, and I'd like to say Let me ask you to go to the issues that I think it would be helpful for the parties to assist us on, and that is the take issues under Section 9. My question there, and I'm only going to focus on the eagles and the flycatcher, not the razorback. If you had nothing more than the Omer report, do you think that the language in the report is sufficient to meet the criteria of what's at stake under Section 9? The answer is yes, Your Honor. I think that is adequate because it deals with the place that the lake plays in the overall food chain and nesting locations and proximities for the three nesting pairs of eagles. But it is coupled not just with that affidavit, but with a two-day trial before Judge Marcus earlier on a motion for temporary injunction where the testimony about the eagles and the importance of the eagles and cultural and endangered status was emphasized. It was emphasized by more than the biologists from the United States. I mean by the biologists of the St. Charles Apache tribe, but by the testimony of tribal members and others. So there was ample testimony of the relationship between the eagles and what would happen if the BIA is to drain the lake. The unique situation here is the BIA takes this unique position that when an appropriation was adopted in 1924 to begin building the lake from that day forward, it never has to apply any Federal law protecting the environment or the health and safety of the people adopted by Congress, not ever, never now, and never in the future. What the district court said, as I understood, he went through all this evidence, the various affidavits and reports, and the bottom line, it seemed to be on the eagles, was he said that the evidence shows potential for harm, but not enough to show that the drawdown would Well, there's two problems with that, Your Honor. This is a motion for summary judgment. He didn't hear the testimony or see the witnesses. He evaluated the testimony and the witnesses and made a decision of fact, and this was a motion for summary judgment. And the biologists from the St. Charles Apache tribe testified that it would be a take, and that it would also interfere and harass, which are all elements of the Endangered Species Act, the fledglings just at the time, that there would be a lot of fly and a lot of hunt around. And so not only did he evaluate witnesses he didn't hear, but he made decisions of fact which are inappropriate in the context of the summary judgment. And the last facts should be construed in favor of the movement, we understand, but the evidence was substantial. Well, as I understood some of the evidence, and I think this included the biologists from the tribe, she was discussing the complete drain down of the Lake McGraw, which I understand has, I think the district court said 21 times between 1934 and 1995. Is that correct? Yes. Okay, two questions here. First is, is evidence regarding what happens to a complete drain down of the lake pertinent to this action where you're asking for an injunction for a specific level much higher? And second, if in fact the lake has gone under that level, and it's not like most of the months, it's been under the level you're speaking at, at least several occasions it's gone dry completely, and the eagles are still there, is there really a basis for the district court to think there is an issue as to whether those eagles will be lost? Well, that's not an issue either, because first of all, she was talking about a threat to drain by the BIA to drain the lake dry, a decision that we asked them to examine under Section 7. During this process, we found out that they decided that the environmental laws did not apply. And secondly, everyone testified that even though there might be a lot of dead fish for the eagles to eat, when they first all die, not that it does disrupt their mating and habitat and fledgling growth, and it takes years for them to come back and raise families themselves. And so here, still, he is making decisions of fact in the context of the federal judgment. Yes, there is many other reasons for the court to understand that this would be a taking, an interference, a harassment, and an interference with the fledgling's reproduction itself. And the lake itself was declared by the United States as endangered habitat and necessary for the recovery of the wild eagle, as was the healing water above it. So, both in the decision by the BIA that the federal environmental laws do not apply and they do not have to observe them, and in the decision by the court deciding as a matter of fact that both were wrong in the context of summary judgment, the court erred. In terms of the Native Grave Protection Act, it is a longer name, NAGPRA, the Apaches, while they lived below the high water mark, which didn't used to exist before the lake was built, had their farms and camps all along both sides of the healing river, right down to where the dam is now located. And when they buried their elders, the old people were buried on the second and third terrace above the bow of the river and is below now the high water mark of the lake. They were also buried near Fort San Carlos, which is called Old San Carlos, and there's a large cemetery there, which when the waters are lowered, the wave action erodes the graves and exposes the dead of the San Carlos Apaches. And the inadvertent discovery, which the BIA claims that was not made, was testified to by the tribal elders, and specifically testified by Ms. Swift, who took the BIA out there and at the time pointed out funerary objects at an Apache school floating below water. And the district court decided that that evaluated those witnesses, and he was not present at the time that that testimony was made, and decided that it was self-serving. Do either the American Graves Protection Act or the National Historic Preservation Act explicitly provide for a private right of action? The Graves Protection Act and the National Historical Preservation Act? I believe they do, Your Honor. They have explicit provision for a private right of action? I believe they do. I'm glad they do. And NEPA, depending on how the case is brought, would have to be brought under the APA, but we do not believe that the tribes under NEPA would have to bring that option under the APA, for example. But they can, as a tribe, bring an option to protect their dad and their funerary objects. We're just about out of time. I'd like to say it's time for a rebuttal, Your Honor. Okay. We'll hear from the United States at this time. Mr. Perry? Good morning. Is there going to be an apportionment of time here? I'm going to try to talk for 12 minutes and then turn some time over. Okay. May it please the Court, Michael Gray on behalf of the United States. I'll start with the Endangered Species Act issue with respect to the summary judgment documents for the bald eagle. Of course, the standard for an injunctive relief under Section 9 of the ESA is that there has to be a reasonable certainty that the action will cause an imminent harm to the species. And none of the documents relied upon by the tribe in this case establish that level of harm. At most, they establish a potential harm, and they only do so, as Your Honor was noting, on a complete drawdown of the lake. And in this case, they're saying that there will be a take when you go below 75,000 acre feet. And that level of evidence is simply not sufficient to survive summary judgment. It cannot establish that there's a reasonable certainty of an imminent harm. It's purely speculative. What about Mr. – I guess I should say Dr. Omer. He's saying that they're actually – it's not a question of whether it will have, but they are having as a result of the drawdown, the serious harm on the – at least two species relative to the recruitment of the young to the population. Why isn't that sufficient? Well, there are a couple of reasons. One is that his statements are merely conclusory. He just says with no – That's what experts do, isn't it? Right. I mean – There has to be some other – I believe the case law is there has to be some support for their conclusions. Right, so he's been out in the field for, I don't know, 20 years, and he's got a fancy resume, and he tells you he went out and he did this study, and I don't know. Here's my big problem with the Eagles, anyway, is that this report said his report was suspect because it was contrary to the other evidence in the record. And that may be, but that seems to me to really be a weighing of the evidence. And I don't know what's right or wrong. I mean, he may be totally full of baloney, but the fact is that he has the credentials and the analytical data in the exhibits that underlie his decision. How is it we could have a summary judgment in the face of that evidence? I think there are a couple of things. The first is the particular part of his report that the district court was referring to is the sentence that says, the period of water releases for irrigation coincides with the time period that the Eagles are in the nest. And that's a statement of fact. It's not as if he said, in my expert opinion, Eagles are in the nest in June and July, you know, when these things are going down. He said, and all the other evidence was that Eagles are now in the nest from February to May. And so he can't just simply. So maybe everybody else is wrong. I mean, I don't know. But he didn't. The point is that the expert didn't assert that Eagles are in the nest some other time from February to May. He asserted that they're in the nest when the drawdowns occur. And the drawdowns don't occur under the facts when the Eagles are in the nest, February to May. And so the district court wasn't required to credit that particular statement. But the larger point is, even if the district court was wrong and weighed some evidence, this court's review is de novo on summary judgment. And the report must still rise to the level of establishing a genuine issue of material fact about this on its own. And it does not do that because it's not tied to any particular level in the lake. It just says when there's a complete drawdown. And their allegation here is that the take will occur below 75,000 acre feet. It's conclusory. And there's no dispute in the record in this case that there has been no major fish kills, which is what his report relies on to affect the bald eagle, that there will be a major fish kill. There's no evidence to indicate that's ever happened at any level in the reservoir above 15,000 acre feet. And so even if you credit his statements, that would only occur on a nearly complete drawdown of the reservoir. And even then, it's only speculative as to how the eagles would react to that fish kill. And so we don't believe that is enough to establish the reasonable certainty of an imminent harm to the eagles through a drawdown of the reservoir below 75,000 acre feet. The Southwest rule of flycatcher is essentially the same. The only thing they rely on is the OMERT report. And the same principles apply there. The report only talks about when the reservoir is lowered, you know, completely withdrawn. That's going to affect the rule of flycatchers. Could you help me on that? Because, you know, this is a massive record, and we've tried to go through it as carefully as we could. But I think that's actually a critical point that you make, and that is, is it benchmarked against the 75,000, you know, the level that was argued. But he talks about fluctuating levels, so in other words, up and down. I guess I didn't read it to say or to understand that he was talking about when there's a complete drawdown. And is there somewhere that you have handy that you can point me to where you think that the appellant's evidence really relates to a complete drawdown and not some kind of fluctuation? Let me suggest this, since I don't want to take up more time. We have this little piece of paper that the clerks have where you can submit supplemental authorities. I'm not asking for any supplemental authorities. I'm just asking for a record reference, which you could do afterwards. I will attempt to do that. If I might, I'd like a couple of days. I don't know if the panel is aware of it. The attorney who was going to give argument in this case caught pneumonia. This is a massive record, and I've only approached this case in the last two and a half days. So if I could have a couple of days to try to sort through the record on that, I would appreciate it. Thank you. Unless the Court has questions about the Graves Protection Act, I think I will move on to the APA issue on the common law nuisance claim. The Supreme Court in the Norton v. Southern Utah Wilderness Alliance case last term in a unanimous decision made clear that the APA Section 702 waiver of sovereign immunity insists upon agency action. And so agency action under the APA is defined as a rule, order, sanction, relief, or a licensing. And the day-to-day operations of this reservoir does not fall within any of those particular categories. And so there was no jurisdiction under the APA for this common law nuisance claim. There's also no final agency action, as the day-to-day operations of the reservoir do not represent the consummation of any agency decision-making process, and the day-to-day operations of the reservoir don't decide any rights or determine any legal obligations. To answer Your Honor's question about the National Historic Preservation Act, there is no explicit private right of action in the NHPA. The courts that have found a private right of action have implied it from the attorney's fees provision. We don't believe there's any need for the court to do that because the National Historic Preservation Act is fully reviewable under the APA, and the attorney's fees provision could apply to any action brought under the APA for the National Historic Preservation Act. Finally, with respect to the breach of trust issue, we believe that any breach of trust in this case would have occurred certainly by 1935, with the entry of the Globe Equity Decree, and, you know, if not, upon the authorizing legislation for this dam. And there's no continuing, the continuing claim doctrine would not apply here because the breach of trust occurred then, and the day-to-day operations of the reservoir that would result in any drawdown did not create a new individualized harm under the continuing claim doctrine, but are simply a result of that earlier decision. If there are no other questions, we would ask that the Court of Fraud and I will turn it over to my co-counsel. Thank you. I appreciate your coming in and doing it on short notice. No problem. Mr. Lewis. May it please the Court. My name is Rodney Lewis, and I'm the General Counsel for the Gila River Indian Community. The Pima Indians have used this water from the Gila River for over 2,000 years, since time immemorial. We were cast in prosperity into poverty and illness when upstream diversions occurred in the late 19th century, and our water was taken. The United States government took action in the 1924 Coolidge Dam, and the San Carlos Indian Irrigation Project was authorized. In 1935, a consent decree, as was outlined previously, was entered into on behalf of the Pima Indians, and this allocated water is among the parties upstream and downstream, above and below Coolidge Dam. As a result of the congressional action of the 1935 consent decree in this case, Pima Indians have full beneficial ownership and control of the natural flow and the stored water, which is stored behind Coolidge Dam. We have the right, under Globe Equity 59, to store water in the reservoir, and the stored water is to be used exclusively for the benefit of the community, the Gila River Indian Community. There's a high issue in this case as far as we're concerned, whether the Apache tribe can force the United States to transfer our interest in the world, the stored water and natural flow water, to the Apache tribe, store it for the benefit of the bass fishery lake, which is now in existence behind Coolidge Dam. I think it's clear from the record the Apache tribe could not document any harm to the environment, the public health, or endangered species over the past 75 years. Congress, in 1992 I believe it was, gave the Apache tribe the ability to use water from the Central Arizona Project to maintain the water levels behind Coolidge Dam. We're asking this time that this court affirm the judgment of the district court in this case and reject the arguments presented by the Apache tribe. Thank you, counsel. Mr. Salmon. Good morning. Good morning. Reiney Salmon with Salmon, Lewis & Weldon, attorneys for the San Carlos Irrigation and Drainage District. Can you pull the microphone over a little bit and speak right into it? Thank you. No, I won't be long. In response to a question from the panel about the trial court's comment regarding certain evidence being suspect, that, too, caught my eye when I was reviewing the briefs. But then I went further and read the briefs and read the decision closely. And I believe that what the trial court was saying was, in addition to what Mr. Gray has pointed out regarding the timing of the nesting of the eagles and of these things, I believe the court was saying that there just simply wasn't a genuine issue of material fact. And, of course, that is a burden of proof upon the Apache tribe. And so, in essence, that's all I have to add. If I had to add more, if I could add more to help the panel, I certainly would. But with that, I will thank the panel and excuse myself. Thank you, Mr. Salmon. Mr. Sparks, we'll give you two minutes for rebuttal. How many, Your Honor? Pardon me, Your Honor. I didn't hear you. Two minutes. Okay. Your Honor, you still intimidate me with that black robe on, no matter how long I've answered, if I've known you. And I'd like to clarify, first of all, your question about whether there's express cause of action under the National Historic Preservation Act. And the answer is no. It's implicit. And this Court had decided in Tyler v. Cisneros that it was implicit. And the Third Circuit did so in Borehead v. Corporation. Are those cases pre-Sandoval? Pre-Sandoval. I don't know the answer. And, Your Honor, let me just address the 75,000-acre-foot mark. We took that case from a study done by the Bureau of Reclamation and the U.S. Wildlife, Fish and Wildlife Service. If there is a number that should be used instead of that number and it would be a larger number or a smaller number, we would accept their expertise. But that's what the evidence said. The argument they're making is, whatever the number is, that your affidavits don't actually track to any specific level, that they're too general. The report of the United States Bureau of Reclamation says 75,000-acre-feet and goes to a specific contour mark on the side of the lake. So there was that evidence. In terms of the eagles, Mrs. Moore, who was a tribal biologist, and Jamie Driscoll, who indicated that such a drainage, such an occurrence on the lake, would have a devastating and taking an adverse effect on the eagles. Let me address just the question about what did the Settlement Act do for San Carlos. It didn't do anything except allow San Carlos, allow the Secretary of Interior, to trade water which the Secretary of Interior owns in San Carlos Lake as converted to ownership for water that she has in the CEP and deliver that water to the irrigation districts downstream and keep the water in San Carlos Lake. The BIA takes the interesting position that to release all the water from the lake or to retain all the water in the lake at any given time requires no environmental compliance on their part because they're exempt since 1924, Congress having given them no obligation to comply with future environmental acts. The Landowners Agreement says that it's subject to future acts of Congress. That is the one that governs the operation of the lake. There's two kinds of water in that decree. Stored water, which is a kind in the lake converted to ownership. It's owned absolutely by the United States for irrigation of the Pimas and Skid and for other purposes. The Secretary has that or avail multiple other water sources and in that situation, the Secretary can use multiple mitigating circumstances in order to comply with the lake. And when the Southern Wilderness Judge Scalia said that there needed to be a discreet decision in order to examine this case, this type of case, and that discreet decision by the United States was a decision that none of the environmental laws of the United States enacted after 1924 applied to it. And therefore, whenever it decides, not on a day-to-day basis or a general operation, when it decides to empty the lake, that is a violation of that's an implementation of that one discreet decision, which we did not discover had been made by the United States until we asked them to examine it under Section 7 and 9. Okay. Thank you both counsel for their argument. The case just argued will be submitted for decision and the court will stand in recess for the day. All rise. Thank you.
judges: Hawkins, McKeown, Clifton